Filed 8/27/13  P. v. Dawson CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B243679 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA304386) |
| DURAND LANCE DAWSON, | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Abzug, Judge.  Affirmed.

        Jessica C. Butterick, under appointment by the Court of Appeal, for Defendant and Appellant.

        No appearance for Plaintiff and Respondent.

Defendant and appellant, Durand Lance Dawson, appeals from the judgment entered following revocation of probation previously granted following his pleas of no contest to felony theft from an elder or dependent adult (Pen. Code, § 368, subd. (d)) and the misdemeanor of contracting without a license (Bus. & Prof. Code, § 7028, subd. (a)). The trial court sentenced Dawson to four years in prison and ordered him to pay a total of $35,356.49 in restitution to the victims (Pen. Code, § 1202.4, subd. (f)). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*[1]

Dawson "utiliz[ed] a fraudulent contractor's license [to make] financial agreements with the victims for construction and remodeling work to be done at [various] properties." In some cases he acted with a co-conspirator, Terrance Green, while in others he acted alone. In one instance, on January 12, 2004, Dawson entered into a contract with Sharon and Selton Johnson. He was to remove and replace windows for a fee of $14,865. "During the course of the work, which started after the agreed [upon] date, . . . Dawson accepted a $5,000.00 down payment, [then] failed to complete the work . . . ." A later inspection of the work Dawson had performed indicated he had not installed the type of windows contracted for.

Sometime between March 31, 2004 and June 19, 2004, Dawson entered into a contract with Sharon and Donald Norfleet. He had again agreed to remove and replace windows as well as do some exterior painting for a fee of $9,300. After accepting a down payment of $4,000, an amount in excess of the 10 percent prescribed by law, Dawson began work a month after he had promised to start. He painted the exterior of the home then, at the end of June, after receiving an additional payment of $4,300, "abandon[ed] the job" leaving debris around the house and failing to replace the windows. In addition, Dawson apparently did a "poor paint job."

On July 15, 2004, Dawson entered into a contract with 72-year-old Betty Austin to "build a garage conversion and [perform] other construction for [a fee of] $20,400.00."

---

[1]     The facts have been taken from the probation reports.

Austin paid Dawson $14,000 in cash and signed over ownership of a Ford truck valued at $3,000, an amount far in excess of the 10 percent down payment prescribed by law. Although Dawson performed some work, it was unsatisfactory. Austin "had to pay additional monies [to have redone] plumbing and electrical work . . . [Dawson had] left unfinished."

When contacted in 2006, Austin indicated Dawson's actions had cost her "both financially and emotionally." After paying Dawson $17,000, she "had to pay to have the plumbing and electricity restored in [her] garage." In addition, "[a]n appraiser . . . informed her . . . the value of her home ha[d] been substantially reduced based" on the condition in which Dawson had left it. Austin had to have debris removed from her yard and to replace the garage door. She also needs to have the electric garage door opener, which Dawson removed, replaced in addition to the plumbing and electrical work. "[B]ased on her age and circumstances, [Austin] is unsure [whether] she will ever be able to return the home to [its] original condition," much less have the work done which she had anticipated Dawson would perform.

2. *Procedural history.*

On June 16, 2006, a felony complaint was filed charging Dawson in counts 1, 3 and 5 with diversion of construction funds, a felony in violation of Penal Code section 484b. In counts 2 and 4 Dawson was charged with grand theft of personal property, a felony in violation of Penal Code section 487, subdivision (a). In count 6 Dawson was charged with theft from an elder or dependent adult, a felony in violation of Penal Code section 368, subdivision (d). Dawson was charged in count 7 with the fraudulent use of a license number, a felony in violation of Business and Professions Code section 7027.3, and in count 8 he was charged with conspiracy to commit a crime, a felony in violation of Penal Code section 182, subdivision (a)(1). In counts 9 and 10, he was charged with accepting an excessive down payment in contract, a misdemeanor in violation of Business and Professions Code section 7159, subdivision (d) and in counts 11 and 12 he was charged with contracting without a license, a misdemeanor in violation of Business and Professions Code section 7028, subdivision (a).

3

At proceedings held on April 24, 2007, the prosecutor indicated a disposition had been reached in the matter. The district attorney stated Dawson had brought in approximately $4,000 in restitution that morning "pursuant to an earlier agreement." It was, however, not all of the restitution and the prosecutor indicated the remaining restitution would be "handled through the Probation Department." The prosecutor continued, "Mr. Dawson is going to go ahead and plead to . . . counts 6 and 11[, theft from an elder or dependent adult and contracting without a license]. [¶] There are going to be five years of formal probation [which is to include] 150 days in the county jail." The district attorney then indicated, instead of serving the time in jail, "home detention" with electronic monitoring would be acceptable.

Dawson waived his right to a jury or court trial, his right to a preliminary hearing, the right to use of the court's subpoena power to compel witnesses to come to court to testify on his behalf, his right to cross-examine the witnesses who had been called to testify against him and his right against self-incrimination. The prosecutor explained to Dawson that, with regard to counts 6 and 11, he faced four years and six months in state prison and, if all the charges were to be combined, he would be subject to eight years in prison with regard to the felonies and one and one-half years for the misdemeanors, for a total of nine and one-half years of incarceration. The prosecutor then indicated that, should Dawson violate any of the terms of his probation, the trial court had the power to sentence him to prison. After service of his prison term, he would be placed on parole. Should he then violate a term of parole, the trial court could again sentence him to prison. Finally, the prosecutor stated that, "as a result of the plea[,] there [was] going to be a restitution order." With regard to Teresa Jones, Dawson was to pay restitution in the amount of $4,545.76. As to Betty Austin, Dawson was to pay $19,400. With regard to Sharon Johnson, Dawson was to pay $4,511.55 and for the harm inflicted on Donald and Sharon Norfleet, he was to pay restitution in the amount of $7,489.18.

After indicating he understood the terms of the plea, including the payment of restitution to each of the victims, Dawson pled no contest to felony theft from an elder or dependent adult in violation of Penal Code section 368, subdivision (d) and the

4

misdemeanor of contracting without a license in violation of Business and Professions Code section 7028, subdivision (a). The trial court found the plea to have been "knowingly, intelligently, and voluntarily made[,] . . . accept[ed] the . . . plea and [found Dawson] guilty based on [the] plea."

The prosecutor and defense counsel waived time for sentencing and the trial court, "[p]ursuant to the plea agreement," suspended imposition of sentence and granted Dawson probation for five years. Among the conditions of his probation, Dawson was to "serve 150 days in the county jail," the time to be served pursuant to "electronic monitoring or home detention,"[2] and "make restitution to the victims in an amount and manner described by the probation officer." Dawson was to report to the Probation Department within 48 hours of sentencing to set up a plan under which he would pay restitution in the amounts previously stipulated to. Although payment of restitution to the victims was to take precedence over all other costs and fees, Dawson was also ordered to pay a $200 restitution fine (Pen. Code, § 1202.4, subd. (b)), a $20 court security fee (Pen. Code, § 1465.8, subd. (a)(1)), a stayed $200 probation revocation restitution fine (Pen. Code, § 1202.44) and $125 in attorney fees (Pen. Code, § 987.8). Before ending the proceedings, the trial court dismissed the remaining counts and allegations.

At proceedings held on August 28, 2008, the trial court informed Dawson he had "a right to have a formal probation violation hearing." Dawson, however, indicated he was willing to give up that right and admit he was in violation of the terms of his probation based on allegations made in a June 15, 2008 police report. Based on Dawson's admission, the trial court revoked, then reinstated his probation. The court indicated Dawson's probation was to be continued "on the same terms and conditions" as previously imposed, but with the following modification: Dawson was to "enroll [in] and complete a 52[-]week domestic violence counseling program." In addition, Dawson was to report to his probation officer within 48 hours of the hearing, then return to court on

---

[2]    The trial court gave Dawson presentence custody credit for 24 days previously served.

November 18, 2008 "for proof of progress on the restitution and proof of progress on his domestic violence program obligation."

Although his counsel made an appearance, Dawson was not present at proceedings held on November 18, 2008. The district attorney indicated he believed Dawson might be in custody on another matter and, if that were the case, the prosecutor would "just request he be ordered out" for a hearing which could be held on November 24. The trial court agreed with the prosecutor's assessment of the situation and, although the court revoked Dawson's probation, it ordered that a bench warrant for his arrest be held until November 24, 2008.

At proceedings held on November 24, 2008, it was determined Dawson, who was present with his counsel, had an open case in Torrance. The trial court ordered this matter to "trail [the] open case" and continued it until December 5, 2008.

On December 5, 2008, defense counsel informed the court Dawson, who was present at the proceedings, was out of custody. The trial court then informed the parties that "a probation violation from downtown" had been filed. The court continued, "[T]he problem I have [is] I remanded him to custody last time on . . . $55,000 bail. He bonded out. And he's here today. . . . [I]t concerns the court [because] this is a . . . felony probation violation." The prosecutor then informed the court he had received "a call from the Deputy D.A. in consumer protection who prosecuted Mr. Dawson [in the Torrance matter]." The prosecutor indicated the case had involved the writing and cashing of forged checks for large amounts of money while Dawson was still on probation for theft. After the trial court indicated it intended to revoke probation in the present case, the parties discussed the matter of "custody status." Dawson's counsel argued Dawson, who had posted bail, had nevertheless appeared before a court where a violation was pending. Counsel stated, "Mr. Dawson is here. He's here on time. And I'm asking [the] court to allow him to remain in his current status. . . . I don't see what the change [in] circumstances are. He's entitled to bail out."

After revoking Dawson's probation in the present matter, the trial court indicated defense counsel's point regarding a change in circumstances as to Dawson's custody

6

status had been "well taken." The court did, however, indicate it wished to resolve this new matter from downtown as quickly as possible and if a resolution could not be reached at the next hearing, the court would set it for a preliminary hearing. The trial court then released Dawson on his own recognizance and ordered he "not . . . possess any [blank] checks." After ordering a pre-plea report from the Probation Department, the trial court ordered Dawson to return to court on December 29, 2008 without further notice.

At a hearing held on March 19, 2009, the trial court dismissed the "open case" brought by the Los Angeles District Attorney "due to delay." The prosecutor had failed to timely bring the action before the court. On April 16, 2009, Dawson's Torrance matter was dismissed. At proceedings held on that day, the trial court continued the present matter to June 11, 2009 "for further proof of progress on probation."

At a hearing held on June 11, 2009, the trial court held a discussion with counsel off the record, then reinstated probation with the "same terms and conditions" as previously ordered. The court continued, "The People do reserve the right to conduct an in-lieu-of probation violation hearing based on the Torrance incident. [¶] At this time, though, I want [Dawson] to continue with his domestic violence counseling and paying victim restitution and then come back to court for proof of progress on both of those on September 21, 2009. [¶] And if there's something that happens sooner where the People want [Dawson] to come in earlier, they will notify the court and counsel."

Several hearings were held during the remainder of 2009 and 2010. At each proceeding, Dawson was ordered to provide "proof of progress" with regard to the conditions of his probation. At one hearing, he was ordered to provide "a statement of assets." At another, the trial court ordered him to provide "proof of progress in the domestic violence counseling program."

Dawson failed to appear at a hearing held on February 7, 2011. After the prosecutor informed the trial court Dawson's probation was set to expire on April 24, 2012, the court "revoke[d] probation and toll[ed] it." At Dawson's counsel's request, the trial court issued a bench warrant in the amount of $75,000, then ordered it held until

7

February 22, 2011 in order to give Dawson the opportunity to voluntarily make an appearance. After the prosecutor indicated that, on February 7, the court might wish to set a "formal probation violation hearing," the court responded, "The possibilities are endless. Let's see if he shows up, and then we'll cross that bridge when we come to it."

A hearing was held on February 23, 2011. Dawson appeared with his counsel and the trial court recalled and quashed the $75,000 bench warrant. The prosecutor then indicated, although Dawson had completed his obligation to attend counseling, with regard to the restitution ordered, there were "tens of thousands of dollars still owed to various victims." Defense counsel then indicated Dawson was on general relief and had been throughout the pendency of his probation. He had been receiving only $200 per month. Counsel argued, under these circumstances, it could not be argued he was not in compliance with the terms of his probation. The trial court responded: "[T]his is how I look at it. Number 1, probation is contingent upon satisfying all the probationary obligations, including restitution. And I will do anything and everything that is within my power to make sure that the victims in this case are fully compensated, including extending probation out to the maximum that I can." The court then indicated, if the People were to find evidence indicating Dawson had been "willfully evading his responsibilities to pay restitution" they should place the matter on calendar. In the meantime, the court reinstated Dawson's probation and set a hearing for June 23, 2011 for a report as to whether Dawson had made any progress with regard to his obligation to pay restitution.

On September 7, 2011, it was determined Dawson had "visited [a] financial evaluator on August 19, 2011." As a result of the evaluation, the trial court ordered Dawson to make restitution payments in the amount of $60 per month. The trial court then admonished Dawson, indicating if he did not show proof of such payments at the next proceeding, "the imposition of county jail time [might] result."

At a hearing held on April 19, 2012, the trial court summarized the proceedings indicating that, due to periods when probation had been revoked, it had essentially been extended for approximately nine months. The court noted Dawson was working for the

8

Clerk's Office for Los Angeles County and under the current court order was to pay $60 per month toward restitution to the victims. The court indicated it could do one of two things: (a) "convert the restitution [to a] civil judgment [pursuant to] Penal Code section 1214" or (b) "extend probation nine months, which would put it out . . . to January 23rd, 2013." After a fairly lengthy discussion between the parties, the trial court decided to hold a hearing to determine whether Dawson was in violation of the terms of his probation.

The prosecutor indicated Dawson was in violation of probation in that he had failed to pay restitution to the victims, failed "to do a financial evaluation" and failed to report on April 6, 2012. Under the circumstances, the prosecutor believed "some additional jail time [was] warranted." In making these allegations, the prosecutor was relying primarily on the probation officers' reports.

Defense counsel objected, indicating if the prosecutor was going to rely on the probation reports the defense should be provided with the opportunity to cross-examine the authors with regard to the authenticity of those reports. The trial court then stated it was its understanding one did not have the right to confront and cross-examine witnesses at a probation revocation hearing. The court, however, in the interest of fairness determined if defense counsel wished to have the probation officers at the hearing, they "should be [t]here." Accordingly, the court revoked Dawson's probation "to toll the running of the statute," and set a hearing date for a time which would allow the probation officers to be present. At the end of the hearing, the court released Dawson on his own recognizance.

On July 26, 2012, a hearing was held to determine whether Dawson was in violation of the terms of his probation. Deputy Probation Officer Doris Icute had been Dawson's probation officer until January 2011. When Dawson had reported to Icute on August 5, 2010, he indicated he was not working at the time. In the same report, Icute noted she had received a telephone call from one of the victims, Theresa Jones. Jones indicated she had not received any money in restitution and asked Icute when Dawson's next hearing was to be held.

During the two and one-half years she supervised him, Icute prepared five separate probation reports. In the first report, dated November 2008, she indicated Dawson had made two restitution payments totaling $200. In Icute's report from September 2009, she indicated Dawson had made three restitution payments totaling $300. Dawson, however, had never made payment directly to Icute. He always told Icute he had mailed the payments to the Probation Department. Moreover, Icute never saw receipts for the payments allegedly made and Probation Department records indicated Dawson had made four, not five, payments.

Dawson indicated, while he was attending the domestic violence counseling program, the trial court had ordered him to pay for those sessions before making additional restitution payments. However Dawson's assertion is not supported by the record. Nowhere in the record of prior hearings can it be found the court made such a comment. The trial court noted the only notation it had found which addressed whether restitution payments were to be subordinate was in the trial court's notes of May 10, 2010. There, the court wrote: "[A]ll restitution [is] to be paid to victim restitution prior to being applied to any other source."

Ivory Thomas acted as Dawson's probation officer from September 2011 to January 5, 2012. After January 5, Probation Officer Dana Harper took over Dawson's case. However, before he passed Dawson's case on to Hopper, Thomas had scheduled Dawson for an appointment with a financial evaluator on January 10, 2012. On January 10, Dawson cancelled the appointment "due to job training." According to Thomas's records, the last restitution payment made by Dawson while he was under Thomas's supervision was for $20 and had been made on December 14, 2011. At that time, Dawson had told Thomas he was unemployed but was working with the Department of Employment in an attempt to find work.

On April 17, 2008, Dawson underwent a financial evaluation. Pamela Fletcher had reviewed the report which, in 2008, included as a condition of probation a payment plan which required Dawson to pay $100 per month toward restitution for the victims. Dawson had included in his financial evaluation two receipts indicating he was being

10

paid $1,500 per month as an employee of a moving and storage company. It was also noted he was paying $1,100 per month toward a mortgage. Although Dawson's ex-wife actually owned the home, Dawson paid the $1,100 per month to live there with his children.

According to the probation reports, Dawson underwent another financial evaluation in April 2010. As a result of that report, his monthly payment was reduced from $100 per month to $30 per month. A third financial evaluation was scheduled for January 10, 2012. However, Dawson cancelled the appointment indicating he was being trained for a new job and could not take the time off. Fletcher had not heard from Dawson since that time.[3]

Harper was Dawson's probation officer at the time of the present hearing. She had been supervising Dawson since March 2011. On March 31, 2011, Harper had a conversation with Dawson during which she reminded him of his obligation to make restitution and informed him that he was delinquent in his payments. According to Harper, Dawson became angry with her and indicated, although he had obtained a Master's Degree in Business Administration from the University of Southern California (USC) the previous year, due to his criminal record he was having difficulty finding a job.

Harper and Dawson met again on February 3, 2012. Dawson indicated he had obtained a position at the Los Angeles County Clerk's Office and he appeared amenable to making restitution payments. Harper made arrangements with Dawson to meet again on April 6, 2012. Pursuant to a court order issued on March 29, 2012, Dawson was to have another financial evaluation by April 8, 2012. After their February 3rd meeting, Harper recommended to the court that Dawson's restitution balance "be committed to a civil judgment." Such a recommendation is generally made when an individual is

---

**3**    Although Dawson had met with financial evaluators on two different occasions, he has missed three other appointments.

approaching the end of his or her probationary period and has still not paid a sufficient amount "to be able to take care of the matter before the [grant of probation] expires."

Dawson reported to the Probation Office on April 6 but did not meet with Harper or her designee and did not make arrangements to have a financial evaluation performed. Although she was still his designated officer, Harper did not see Dawson after their February 3rd meeting. At that point, Harper changed her recommendation. It was Harper's opinion Dawson was in violation of the terms of his probation in that he had failed to follow the trial court's order to have a financial evaluation performed. In addition, it appeared Dawson had not been making his restitution payments. Dawson apparently had the ability to show what payments he had made because, according to Harper, the Treasury Tax Collector's Office issues a monthly statement indicating what funds have been collected by the Los Angeles County Probation Department on the probationer's behalf. The monthly statement is then mailed to the probationer's address. It is, however, imperative that the probationer place on his or her payment the correct case or account number in order to assure it is credited to the probationer's account for the purpose of making restitution payments.

After Dawson failed to have a financial evaluation performed, Harper recommended to the court that it extend probation for a minimum of six months "to allow Mr. Dawson [the] opportunity to make further [restitution] payments." Harper recommended the extension in part because Dawson "still owed a very large amount of money." According to one record from the Treasury Department, Dawson had paid a total of only $590 in restitution.

Dawson testified in his own defense at the July 27, 2012 hearing. He first indicated that, when he began his service of probation in April 2007, he was ordered to participate in a "work release program" and to make restitution payments. In May 2007, Dawson was employed as a marketing manager. However, he lost the job in August 2007. During that time, with the assistance of his mother, Soakey, he made restitution payments. Dawson mailed the payments and he wrote on each of them either his account number or his case, or "X" number. When he first began making restitution payments,

12

Dawson had some problems with both the account number and the "X" number. Different notices indicating he owed a payment had on them different numbers. Dawson would write on his money order the account number on the notice and it would not always be credited to his account. However, his first probation officer, Officer Venwan, traced the payments and they were eventually credited against Dawson's outstanding balance.

In 2009, Dawson was forced to go on general relief. Dawson has more than one felony conviction and, although he was hired to perform several different jobs, as soon as the employer found out about his criminal history, he "lost [the] job." He was, accordingly, on general relief for approximately two and one-half years and, during that time he received only $221 per month and $200 per month in food stamps. Dawson was therefore unable to make regular restitution payments. His payments were sporadic and of differing amounts. In addition, at times Dawson would mark the payments with the wrong "X" number.

Although his probation officer would tell Dawson his restitution payments were past due, he never received a notice from the Probation Department indicating he was delinquent in his payments. Instead, he simply received documents indicating how much he owed. For example, in December 2011, Dawson received a statement indicating he owed "over 43 thousand dollars."

At one point it appeared Dawson had owned a home, which he sold. However it was later determined the owner was not Dawson, but his father, Durand Dawson, Sr. The purchaser of the home was Dawson's ex-wife, Meredith Dawson, and she bought the house as "her personal property."

Dawson recognized that on March 29, 2012, the trial court had ordered him to report to his probation officer, Dana Harper, or her designee on or before April 8 for a financial evaluation. Dawson, who was working at the time, was given the day off on April 6. However, when he went to the Probation Department on that day, neither Harper nor her designee were in the office. It had not occurred to Dawson to call the Probation Department to be certain either Harper or her designee would be in that day. He simply

13

presumed that one of the officers would be there. When neither was available, Dawson spoke to "the officer of the day." The officer of the day could not perform the necessary financial evaluation and informed Dawson she would have Harper telephone Dawson the following week to arrange for one. Dawson, however, never received a phone call. His probation was subsequently revoked and, after that, Dawson no longer reported to the Probation Department.

On cross-examination, the prosecutor questioned Dawson about his "Statement of Assets." Dawson had indicated that when he was first placed on probation in 2007, he was "allowed to go to work, and come home with the . . . bracelet on [his] ankle." He, however, lost his job in August 2007. After losing the job, Dawson's mother helped him to make some of the restitution payments. Dawson kept track of the payments made by his mother by retaining copies of receipts indicating she had been the one who had paid them. Dawson's mother also helped him pay for the domestic violence program. She apparently understood his situation and did not expect to be paid back.

While on probation, Dawson attended a Master's of Business Administration program at USC. He indicated he had to complete only 12 units worth of classes to finish the program, which he did in May 2011. Dawson completed the program to make himself "more marketable." In order to attend the classes, Dawson had applied for and received a $2,700 grant and had, prior to being placed on probation, taken out approximately $11,000 in student loans from Bank of America. Dawson had repaid approximately $300 worth of his student loans in the previous two years. However, he had recently been hired by the bank and, since that time had paid the bank an additional $75.

After hearing all of the evidence, the trial court determined Dawson had not been truthful in the giving of his testimony. The court first indicated Dawson appeared to have specific motivations to lie and second, none of his testimony was corroborated by any of the other witnesses. Accordingly, the court found Dawson "in willful violation of the term[s] and conditions of [his] probation[] [i]n that he failed to comply with the court['s] order [given] on March 29, [to report to Officer Harper or her designee for a financial

14

evaluation] and failed to make good faith efforts to pay back the restitution which include[d] the responsibility to comply with all court [orders]." The trial court revoked Dawson's release on his own recognizance and remanded him to the custody of the sheriff. The court ordered a presentence probation report and set sentencing for August 17, 2012.**4**

At proceedings held on August 23, 2012, the trial court indicated Dawson, who was at that time in custody, had originally been charged with "11 counts of fraudulent activity . . . . [¶] He subsequently entered a plea of no contest to count 6, which . . . charged him with theft from an elder or dependent adult" and count 11, which charged him with contracting without a license. The trial court indicated "[t]he history of the defendant's performance on probation and the probation revocation proceedings which brought [Dawson to court that day] for sentencing [were] summarized in a Findings of Fact and Conclusions of Law [which the] court filed . . . ." The court continued: "In sum, the court found . . . the defendant willfully violated the conditions of his probation in two regards: First by failing to report to his probation officer, Dana Harper, or her design[ee], by April 8th, 2012, so that a financial evaluation could be performed; and secondly, that he failed to pay restitution to the victims to the best of his ability. The sentence that I'll be announcing today is supported independently by either one of these two violations."

---

**4** On July 31, 2012, the trial court filed a document entitled "Findings of Fact and Conclusions of Law." After summarizing Dawson's case, the court indicated: "It is an unfortunate reality of the criminal justice system that many defendants lack the ability to financially compensate the victims of their crimes. Since Article 1, Section 10, of the California Constitution proscribes imprisonment for debt, once the Court is satisfied that a defendant genuinely lacks the ability to pay restitution, based upon a thorough financial investigation, it has no choice other than to convert his obligation to a civil judgment. [¶] This case is distinguished from many, not by the victims' unsatisfied financial loss, but by the defendant's persistent and intransigent refusal to cooperate with an investigation into his ability to compensate those victims. [¶] Sentencing remains scheduled for August 17, 2012, to determine whether the defendant should be reinstated on probation or sentenced to state prison and, if so, the appropriate base term."

15

After considering all of the relevant material, including probation reports and the prosecution's sentencing memorandum, the trial court indicated it had reached its "tentative finding . . . because the degree of monetary loss to the victims was substantial and the defendant was an active participant in the crime[.] [H]aving weighed all of the relevant factors, [the court] believe[d] that probation should be denied . . . because there [was] a likelihood . . . the defendant would not succeed on probation."

Defense counsel argued Dawson had substantially complied with the terms of his probation for five years. He generally reported to his probation officers in a timely fashion and "ha[d] been trying to secure a job for some time." He has "an extensive family" which has been supportive and would "like to be able to rejoin" them. Counsel asserted, given the five years he has spent on probation, it was "unnecessary to sentence Mr. Dawson to state prison . . . for a financial crime where the primary . . . violation stems from his failure to make restitution payments." Defense counsel believed the trial court's initial inclination, "to convert the restitution to a civil judgment" was the most appropriate way to handle Dawson's case.

The trial court indicated, in addition to the present crimes, Dawson had suffered convictions for a number of misdemeanors as well as a 1996 felony conviction for forgery. In addition, the original probation report in this matter had recommended Dawson be sentenced to the upper term of four years in prison and urged that he not be granted probation. Under these circumstances, the trial court indicated, although Dawson was eligible for reinstatement of probation, "having given the defense a full opportunity to be heard, and considering all the relevant facts related to the crime and . . . the defendant, [the court had found] that the degree of monetary loss to the victims in this case was substantial." The court determined Dawson "was an active participant in the crime" and "there [was] a likelihood [he would] not succeed on probation if [it were to be] reinstated." The trial court accordingly, denied probation.

The trial court considered Dawson's history of criminal and "predatory" behavior, which began in 1991 with misdemeanor convictions for theft, forgery and attempted burglary and continued into 2005 when he drove a vehicle without the owner's consent.

16

Based on this record, the court concluded Dawson's crimes were increasing in seriousness. The court indicated, on the other hand, although it had combed the record it had found no "substantial mitigating" factors. Before sentencing Dawson, the trial court stated, "I have bent over backwards to try to keep Mr. Dawson on probation. I have given him chance after chance after chance." The trial court then sentenced Dawson to the upper term of four years in prison for his conviction of felony theft from an elder or dependent adult as alleged in count 6. After noting that due to realignment, Dawson would serve his term in county jail (see Pen. Code, § 1170, subd. (h)(1)), the trial court awarded him presentence custody credit for 188 days actually served and 188 days of good time/work time, or a total of 376 days. The court ordered Dawson to pay a total of $35,356.49 in restitution to the various victims (Pen. Code, § 1202.4, subd. (f)) then signed orders converting the actual restitution owed to "civil judgment[s]." (Pen. Code, § 1214, subd. (b)).

Dawson filed a timely notice of appeal on August 28, 2012.

## CONTENTIONS

After examination of the record, appointed appellate counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record.

By notice filed May 31, 2013, the clerk of this court advised Dawson to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

17

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.

18